MOORE, Chief Justice
(concurring in the result).
I concur in the result reached by the main opinion. I agree that the Health Care Authority for Baptist Health (“the Authority”) is not entitled to sovereign immunity (now referred to as “State immunity”) under Article I, § 14, of the Alabama Constitution of 1901 for reasons set out below. I further agree that extending the $100,000 damages cap of § 11-93-2, Ala.Code 1975, to health-care authorities organized under the Health Care Authorities Act of 1982, § 22-21-310 et seq., Ala. Code 1975, that are not agencies or instru-mentalities of a county or a municipality is unconstitutional.
I write to state that weighing various factors such as tax-exempt status, anticom-petitive conduct, eminent-domain powers, ownership and disposal of property, makeup of the board of directors will not necessarily lead to the proper determination of a sovereign-immunity issue in every case. Different courts and different judges will at different times weigh and prioritize such factors differently. The determination of whether sovereign immunity exists is not arrived at by balancing various factors relating to powers generally exercised by government but, rather, is dependent upon whether the activity involved is a proper function of government according to the Constitution ratified by the people.
Whether the Authority enjoys sovereign immunity under Article I, § 14, must be examined under the provisions of the Constitution of Alabama. I would hold that sovereign immunity from civil actions under Article I, § 14, can exist only when that immunity does not violate the rights retained by the people under the Constitution of Alabama unless that immunity is specifically granted an entity by the people of Alabama in an amendment to the 1901 Constitution.
A historical overview of the origins of state sovereignty in our country is helpful to a proper understanding of sovereign immunity in its most recent forms. One of the first Associate Justices of the United States Supreme Court, Justice James Wilson, who not only signed the Declaration of Independence but who also helped draft the Constitution of the United States, attributed “sovereignty” to the feudal system. In Chisholm v. Georgia, 2 U.S. 419, 2 Dali. 419, 1 L.Ed. 440 (1793), Justice Wilson wrote:
“[Sovereignty is derived from a feudal source; and like many other parts of that system so degrading to man, still retains its influence over our sentiments and conduct, though the cause, by which that influence was produced never extended to the American States.”
2 U.S. at 457. In the earliest stages of our Republic, the term “sovereign” was not readily applied to our federal government, as Justice Wilson explained:
“To the Constitution of the United States the term SOVEREIGN, is totally unknown. There is but one place where it could have been used with propriety. But, even in that place it would not, perhaps, have comported with the delicacy of those, who ordained and established that Constitution. They might have announced themselves ‘SOVEREIGN’ people of the United States: But *422 serenely conscious of the fact, they avoided the ostentatious declaration.”
Id. at 454 (capitalization in original). Nor did Alabama’s original Constitution of 1819 ascribe to State government the term “sovereign,” and it gave State government no immunity under the law for wrongs it had committed. Article 6, § 9, Ala. Const. 1819. Even after the War Between the States, the Constitution of Alabama of 1865 continued to protect citizens in their right to bring suits against the State. Article 1, § 15, Ala. Const. 1865.
Both the federal government as well as our State government recognized, according to Justice Wilson, that the State was an “inferior contrivance” to human authority. “When I speak of a State as an inferior contrivance, I mean that it is a contrivance inferior only to that, which is divine: Of all human contrivances, it is certainly most transcendently excellent.” Chisholm, 2 U.S. at 455.
However, in 1875 a new Constitution was ratified. It included the provision that the State of Alabama “shall never be made to be a defendant in any court of law or equity.” Article 1, § 15, Ala. Const. 1875. (This bar to suit- was retained as Article 1, § 14, in the Alabama Constitution of 1901.) The same year the 1875 Constitution was ratified, the Supreme Court of Alabama began to define the bounds of State sovereignty:
“[I]t is not congruous with the ideas of order and duty, that the State, the August sovereign body whose servants they are, from which proceed all civil laws, and to which we owe unstinted respect and honor, should be held capable of doing wrongs, for which she should be made answerable as for tor-tious injuries, in her own courts to her own children or subjects.”
State v. Hill, 54 Ala. 67, 68 (1875) (emphasis added). Hill starkly described perhaps the essence of Alabama State sovereignty: immunity from suit for “tortious injuries” in “her own courts to her own children or subjects.”
This Court later stated simply: “The state can do no wrong. Neither can her servants do a wrong for it or in its name, so as to make it a party to a suit against them.” Elmore v. Fields, 158 Ala. 345, 851, 45 So. 66, 67 (1907).[21] “This Court, construing Section 14, has held almost every conceivable type of suit to be within the constitutional prohibition.” Hutchinson v. Board of Trs. of Univ. of Alabama, 288 Ala. 20, 23, 256 So.2d 281, 283 (1971). With that, Alabama “closed the door to litigants who had claims against the State, and the door has remained closed continuously.” Id.[22]
*423 Nevertheless, other provisions of the Declaration of Rights in the 1901 Constitution present a seeming inconsistency with the State’s immunity from suit in § 14. Specifically, Article I, § 11, guarantees the right of trial by jury, and Article I, § 13, provides “[t]hat all courts shall be open; and that every person, for any injury done him, in his lands, goods, person, or reputation, shall have a remedy by due process of law.”
That inconsistency, however, must first be examined under Article I, § 36, of the Declaration of Rights, which protects “against any encroachments on the rights herein retained” by declaring “that everything in this Declaration of Rights is excepted out of the general powers of government, and shall forever remain inviolate.” Each of Alabama’s Constitutions from 1819 to 1901 “has excepted out of the general powers of government, the power to violate the right of trial by jury.” Clark v. Container Corp. of America, Inc., 589 So.2d 184, 196 (Ala.1991). In fact, Article I, § 36, prohibits “the Legislature, the executive, or judicial branch, one or all, from destroying or impairing such reserved rights of the people” and “from ever burdening, disturbing, qualifying, or tampering with, these rights, to the prejudice of the people.” Alford v. State, 170 Ala. 178, 213, 54 So. 213, 223 (1910). Because the entire Declaration of Rights is excepted out of the general powers of government, neither the judiciary nor the legislature may extend § 14 sovereign immunity so as to destroy the inalienable rights of the people contained in §§ 11 and 13.
Although the rights contained in the Declaration of Rights are made secure, this Court has also held:
“The presence of these guarantees, we respectfully submit, does not repudiate other provisions of our state’s organic law which the people themselves have established, however inconsistent to some they may appear to be. By adopting § 14, our people have placed a limitation upon their own ability to make their state a ‘defendant in any court.’ It would be incongruous for this court to hold that this particular section [Art. 1, § 14] of the Constitution of Alabama 1901 may not be enforced because it might appear to be in conflict with another. This follows from the requirement that constitutional provisions should be construed as a whole and in light of the entire instrument and to harmonize with its other provisions.”
Deal v. Tannehill Furnace & Foundry Comm’n, 443 So.2d 1213, 1218-19 (Ala.1983). As stated in Deal, there is an apparent conflict between § 14 (sovereign immunity) and §§ 11 and 13 (trial by jury, and open courts). The question then becomes — when does § 14 restrict the rights to trial by jury and access to an open court system?
Whether the Authority is entitled to sovereign immunity depends on whether it is an “arm of the state” and whether it performs a function of State government. Armory Comm’n of Alabama v. Staudt, 388 So.2d 991, 993 (Ala.1980). In Staudt, three elements were discussed:
1. The character of power delegated to the entity;
2. The relation of the entity to the State; and
3. The nature of the function performed by the entity.
388 So.2d at 993.
The main opinion sufficiently examines the first two elements, i.e., the “character of power delegated” to the Authority and the Authority’s “relation” to the State of Alabama. I concentrate here on the third element — the nature of the “function performed by the entity.” Article 1, § 35, of the Alabama Constitution of 1901 declares *424 that “the sole object and only legitimate end of government is to protect the citizen in the enjoyment of life, liberty, and property,” because “when the government assumes other functions it is usurpation and oppression.” Therefore, sovereign immunity under § 14 can never be said to exist for any entity that violates the “sole object and only legitimate end of government” and “assumes other functions.” Because the Declaration of Rights is excepted out of the general powers of government, only the people of Alabama may enlarge the “legitimate end of government” to encompass functions such as health care. Thus sovereign immunity exists only when a government entity functions within its legitimate constitutional sphere.
At common law, hospitals were not within, the sphere of civil government, but were eleemosynary[23] corporations, “constituted for the perpetual distribution of the free alms, or bounty, of the founder of them to such persons as he has directed. Of this kind are all hospitals for the maintenance of the poor, sick, and impotent.” 1 William Blackstone, Commentaries on the Laws of England *459.[24] Our common law inherited much from the canon law of the Christian church, which allowed any group of persons with the proper structure and purpose to form charitable corporations for the purpose of operating hospitals.[25] Harold Berman, Law and Revolution 219 (1983). In accord with English common law, “health care” is not found in the enumerated powers given Congress in Article I, § 8, of the United States Constitution. Nor is such a power to be found under the General Welfare provision as it was understood by our founding fathers. See The Federalist No. 41 at 258-259 (James Madison)(Clinton Rossiter ed., 1961). This legal history demonstrates why hospitals and health care were not considered proper objects and functions of civil government in the United States and in Alabama for many years. Alabama’s early hospitals were organized primarily by churches, religious orders, private individuals, and private organizations, and not by the State.[26]
However, in 1946 the people of Alabama ratified Amendment No. 53 to the Alabama Constitution of 1901 to provide for State hospitals and health facilities. Amendment No. 53 (now Article IV, § 93.12, Ala. Const. 1901 (Off.Recomp.)) provides as follows:
“The state, notwithstanding section 93 of the Constitution as amended and see *425 tion 94 of the Constitution, may acquire, build, establish, own, operate and maintain hospitals, health centers, sanatoria and other health facilities. The legislature for such purposes may appropriate public funds and may authorize counties, municipalities and other political subdivisions to appropriate their funds, and may designate or create an agency or agencies to accept and administer funds appropriated or donated for such purposes by the United States government to the state upon such terms and conditions as may be imposed by the United States government.”
(Emphasis added.) Section 93.12 clearly defines the limited conditions under which the State of Alabama may constitutionally assume the functions of maintaining hospitals and providing health care to the people of this State. Only under the limited constitutional exception of § 93.12 would a State-run hospital be immune from civil action under the concept of sovereign immunity in § 14.
The evidence in this case does not reflect that the State of Alabama ever acquired, built, established, owned, or operated the Authority’s medical facilities. Nor did the Legislature of Alabama appropriate funds or authorize a county, a municipality, or other political subdivision to do so. Because no State entity has availed itself of the provision of § 93.12 in this case, the Authority is not exercising a government function so as to entitle it to sovereign immunity.
The provisions of §§ 22-21-310 through 22-21-359, Ala.Code 1975, the Health Care Authorities Act of 1982, do not, in my opinion, meet the requirements for a State-run hospital under § 93.12 and were never meant to provide for a State-owned and operated hospital. Indeed the Health Care Authorities Act itself permits a health-care authority to be sued in civil actions:
“(a) In addition to all other powers granted elsewhere in this article, and subject to the express provisions of its certificate of incorporation, an authority shall have the following powers, together with all powers incidental thereto or necessary to the discharge thereof in corporate form:
[[Image here]]
“(2) To sue and be sued in its own name in civil suits and actions, and to defend suits and actions against it, including suits and actions ex delicto ant^ex contractu, subject, however, to the provisions of Chapter 93 of Title 11, which chapter is hereby made applicable to the authority....”
§ 22-21-318, Ala.Code 1975 (emphasis added). When the legislature expressly authorized a health-care authority “to sue and be sued in its own name in civil suits and actions,” it cannot be said that even the legislature, which could not create sovereign immunity, ever contemplated such a result for any health-care authority.
Therefore, I would hold that, absent a constitutional amendment, sovereign immunity cannot be extended to shield a public authority, agency, or franchisee that works to deprive the people of their rights retained in §§ 11 and 13. The effect of granting § 14 immunity to the Authority would be to destroy the people’s inalienable rights to a jury trial and to take away a remedy in open court in cases involving such an entity, in violation of Article I, §§35 and 36. Such an application of sovereign immunity, absent the consent of the people of Alabama by constitutional amendment, is void and unconstitutional under §§35 and 36. I agree with the main opinion that under the Alabama Constitution the Authority is not entitled to sovereign immunity.
Furthermore, the $100,000 damages cap of § 11-93-2 is not applicable here because *426 such a cap was never intended under the Health- Care Authorities Act to extend to nongovernmental entities. Moreover, the Authority never claimed to be an instrumentality of either a county or a municipal government and is therefore not entitled to the damages limitations that such government entities presently enjoy.

. The similar maxim "the king can do no wrong” rests on a legal misconception. Joe McElwain, State Immunity from Tort Liability, 8 Mont. L.Rev. 45, 45 (1947) (citing Bou-chard, Government Liability in Tort, 34 Yale L.J. 1 n. 2 (1924)). Originally, the maxim did not mean "that the king could not do wrong in the sense that he was incapable of doing a wrong, but that he was not privileged to do wrong. The king was obligated to right any wrongs which he had done.” Id. (footnote omitted). Sir William Blackstone likewise limited the maxim so: "[I]t means that the prerogative of the crown extends not to do any injury.” 1 William Blackstone, Commentaries *239 (emphasis added).

. One exception is actions arising from the State's legal contractual obligations. See, e.g., State of Alabama Highway Dep't v. Milton Constr. Co., 586 So.2d 872, 875 (Ala.1991) ("Once the Highway Department has legally contracted under state law for goods or services and accepts such goods or services, the Highway Department also becomes legally obligated to pay for the goods or services accepted in accordance with the terms of the contract. It follows that this obligation is not subject to the doctrine of sovereign immunity and is enforceable in the courts.").

. "Of, relating to, or assisted by charity; not-for-profit.” Black’s Law Dictionary 597 (9th ed.2004). An "eleemosynaria” was "[t]he place in a religious house or church where the common alms were deposited, to be distributed to the poor.” Id.

. Eleemosynary corporations were lay corporations, composed of ecclesiastical persons that shared some "of the nature, privileges, and restrictions of ecclesiastical bodies.” 1 William Blackstone, Commentaries *459.

. Donors would make gifts to God to established ecclesiastical corporations for specific charitable purposes, such as the building and operating of hospitals. Harold Berman, Law and Revolution 238 (1983). However, under Roman law, Emperor Justinian had recognized hospitals as charitable societies, under the supervision of diocesan bishops. Roman law did not grant charitable societies the legal privileges of incorporation, which were reserved for cities, public treasuries, churches, and colleges. Id. at 216, 219. Thus, canon law expanded the legal protections for charitable societies. Id.

.See Howard Holley, M.D., The History of Medicine in Alabama (1982). Dr. Holley chronicled the development of 'hospitals in Alabama from colonial times to the 1970s. Holley's survey covers the origins of 27 Alabama hospitals: 21 were organized by religious orders, private individuals, and private corporations; 2 were organized by cities; 2 by federal authority; 1 by a county; and only 1 by the State. Dr. Holley acknowledges he omitted many "privately owned and operated small hospitals.” Id. at 45-74.